UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MARK RANSOM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:19-cv-04266-JPH-DLP |
| ) | |
| WENDY KNIGHT, et al. ) | |
| ) | |
| Defendants. ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

At all times relevant to the complaint, Mark Ransom was a prisoner of the Indiana Department of Correction confined at the Correctional Industrial Facility (CIF). Mr. Ransom alleges that several staff members at CIF were deliberately indifferent and negligent regarding his medical needs related to his leg prosthesis. All defendants have moved for summary judgment. Because no reasonable jury could find based on the undisputed facts that any defendant was deliberately indifferent to a serious medical need, the defendants' motions for summary judgment, dkts. [102] and [105], are **GRANTED** as to Mr. Ransom's deliberate indifference claims which arise under federal law. With all federal claims resolved, the Court declines to exercise supplemental jurisdiction over the remaining state law negligence claims.

I.   **Standard of Review**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party has met its

burden, "the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015). A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941–42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court may rely only on admissible evidence. *Cairel v. Alderen*, 821 F.3d 823, 830 (7th Cir. 2016). Inadmissible evidence must be disregarded. *Id.*

The Court considers assertions in the parties' statements of facts that are properly supported by citation to admissible evidence. S.D. Ind. L.R. 56-1(e). To the extent Mr. Ransom has failed to rebut assertions of fact in the motions for summary judgment, those facts are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); *see* S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts); *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (district court may apply local rules to deem facts unopposed on summary judgment).

Additionally, the Court has no duty to search or consider any part of the record not specifically cited in the statements of facts. S.D. Ind. L.R. 56-1(h).

## II.   Undisputed Facts

### A.   The Parties

Mr. Ransom wears a prosthesis because his right leg is amputated below the knee. Dkt. 102-2 at 1–2 (Reception Diagnostic Center intake records).

Mr. Ransom was incarcerated at the CIF from June 5 to August 22, 2019. During that time at CIF, Chris Hufford was the Health Services Administrator (HSA) and Kate Burdette, Lynette King, and Darlene Shuck were nurses. Nurse Burdette and Nurse King were each the director of nursing for a period of time between June 5 and August 22.

Also during this timeframe, Wendy Knight was warden of CIF; Derek McMullen was the safety hazard manager; Charlie Fox was a major who supervised custody staff; Robert Stafford was the grievance specialist; and Isaac Randolph was the grievance manager.

### B.   Mr. Ransom's Disability and Medical Classifications

Mr. Ransom brought extra prosthetic supplies with him when he entered the Indiana Department of Correction (IDOC) in May 2019.  Dkt. 102-1 at 36 (Ransom Dep. 87:2–10). He was, however, allowed to keep with him only the sleeve, liner, and sock that he was wearing at intake. *Id.* Thereafter, Mr. Ransom would change his sock daily, his sleeve every three months, and his liner every six months. *Id.* at 36 (Ransom Dep. 86:22–87:1).

When Mr. Ransom entered the IDOC, a doctor performed an intake screening and classified his medical status as "G1," meaning that he has a "stabilized, permanent or chronic physical or medical condition in which: frequent monitoring/surveillance is not needed." *Id.* at 23. The doctor classified Mr. Ransom's disability status as "A," meaning that he has "No Disability" and "is capable of performing activities of daily living." *Id.* at 28.

On June 6, 2019, Mr. Ransom's second day at CIF, Nurse Shuck performed a transfer intake screening. Supervised by a doctor, she confirmed that Mr. Ransom had a medical classification of "G1" and a disability classification of "A." *Id.* at 7, 19.

### C. Mr. Ransom's Bunk Assignment

On June 6, a medical provider issued Mr. Ransom a bottom bunk and bottom range pass to accommodate his limited mobility. Dkt. 102-3 at 4 (Correctional Industrial Facility intake records). However, Mr. Ransom was not assigned a top bunk until around June 16. Dkt. 102-1 at 10 (Ransom Dep. 34:14–21). Instead of sleeping on the top bunk, he moved his mattress to the floor for three or four days and then got permission from an officer to sleep in an unassigned bottom bunk. *Id.* at 37 (Ransom Dep. 88:15–89:4).

### D. Mr. Ransom's Shower Difficulties

Because Mr. Ransom could not shower with his prosthesis, showering was difficult for him at CIF. Dkt. 102-1 at 37 (Ransom Dep. 91:10–12). Mr. Ransom reported his difficulties with showering to Nurse King on June 26. *Id.* at 31 (Ransom Dep. 67:10–11). He also filed a grievance on July 28 indicating that he

was worried about falling while showering. *Id.* at 70–71 (Ransom Dep. Exh. C). Mr. Stafford reviewed the grievance and directed Mr. Ransom to discuss the issue with Mr. McMullen, the safety hazard manager. *Id.*

On July 31, Nurse Burdette helped get Mr. Ransom a shower chair. *Id.* at 75 (Ransom Dep. Exh. E). But on August 1, Mr. Ransom submitted an informal grievance to Mr. McMullen saying that he was "having [a] hard time with [the] shower chair." *Id.* at 81 (Ransom Dep. Exh. G). Mr. McMullen referred Mr. Ransom back to Nurse Burdette. *Id.*

On August 9, Mr. Ransom filed a formal grievance demanding a prison transfer. *Id.* at 82. Sometime over the next few days, he was issued crutches. *Id.* at 84. Mr. Ransom filed a grievance appeal on August 18—four days before his transfer to another prison—saying that the crutches were no help. *Id.* at 83.

### E.    Mr. Ransom's Prosthetic Supplies

On June 24, Mr. Ransom submitted a healthcare request asking for a visit to discuss supplies for his prosthesis. Dkt. 102-4 at 1 (medical records). He was scheduled for a visit with Nurse King. *Id.*

Two days later, Mr. Ransom met with Nurse Burdette and provided more details about the supplies he needed: three-ply socks, liners, and barrier cream. *Id.* He explained to Nurse Burdette "what could potentially happen if the care [wasn't] provided for [his] leg." Dkt. 102-1 at 31–32 (Ransom Dep. 67:24–68:2). The same day, Mr. Ransom met with Nurse King. Mr. Ransom believed that Nurse King "wasn't aware of what was going on" until he informed her at the meeting. *Id.* at 31 (Ransom Dep. 65:10–20). She investigated whether the

5

supplies could be purchased at retail outlets, but Mr. Ransom told her they would have to come from a special provider. *Id.* at 11 (Ransom Dep. 39:9–40:3).

On July 1, Mr. Ransom submitted a healthcare request that provided contact information for his prosthetics supplier. Dkt. 102-4 at 2.

Mr. Ransom submitted another healthcare request on July 15, stating that he needed supplies "ASAP." *Id.* at 3. Nurse King wrote back two days later, explaining that she had contacted the prosthetics supplier but that the company would not ship supplies without first establishing who was responsible for payment—Mr. Ransom's private insurance or the Indiana Department of Correction. *Id.*

On July 21, Mr. Ransom submitted two healthcare requests, one seeking to speak with someone about his prosthetic supplies and another to inform medical staff that it was the Indiana Department of Correction's obligation to pay for his prosthetic supplies. *Id.* at 4–5. Nurse King met with him three days later to discuss. *Id.* at 5.

On July 26, Nurse King submitted a request to have Mr. Ransom evaluated for new prosthetic supplies. *Id.* at 6, 8–10. The prison medical director requested pictures of Mr. Ransom's existing liner and socks first. Dkt. 102-4 at 14.

On July 28, Mr. Ransom submitted a grievance about delays getting new prosthetic supplies. Dkt. 102-1 at 74 (Ransom Dep. Exh. E). He asserted that he was "limited getting around," "at times unable to walk," and "constantly in pain." *Id.* Nurse King wrote Mr. Ransom two days later to explain the steps she had taken and the process going forward. Dkt. 102-4 at 6.

6

HSA Hufford and Nurse Burdette met with Mr. Ransom on July 31. Dkt. 102-1 at 75 (Ransom Dep. Exh. E). HSA Hufford took photographs of Mr. Ransom's existing supplies. *Id.* at 40 (Ransom Dep. 100:11–101:9). By August 2, HSA Hufford had ordered barrier cream and socks for Mr. Ransom. *Id.* at 75 (Ransom Dep. Exh. E).

By August 5, Mr. Ransom had been approved for an offsite evaluation for new supplies. Dkt. 102-4 at 15. On August 15, Mr. Ransom saw the specialist, who ordered new custom liners, socks, and sleeves. Dkt. 102-5 at 13 (additional medical records). The specialist also highly recommended that Mr. Ransom receive unscented liquid hand soap to wash his liners. *Id.*

On August 18, 2019, Mr. Ransom was seen by Nurse Burdette to have his supplies cleaned. *Id.* at 11. Mr. Ransom told her it would take 5 hours for his supplies to dry. *Id.* When Nurse Burdette told Mr. Ransom he could not wait in medical for 5 hours, he became belligerent and started swearing at her. *Id.* Nurse Burdette then provided Mr. Ransom a container of liquid antiseptic soap and directed him to clean his own supplies in his cell. *Id.*

At some point before mid-August, Mr. Ransom asked for and received crutches to help him get around. Dkt. 102-1 at 33 (Ransom Dep. 72:21–73:10, 75:19–22).

On August 22, Mr. Ransom was transferred to another IDOC facility. On September 17, he received new prosthetic supplies from the outside clinic. Dkt. 102-5 at 14.

Mr. Ransom reports that "towards the end of August" he had sores on his amputated leg and experienced "a lot of discomfort from not having supplies." Dkt. 102-1 at 45 (Ransom Dep. 121:8-12). He "eliminated the discomfort by not moving around, by staying in one spot, in hopes that [he] would get supplies so [he] could continue to walk." *Id.* (Ransom Dep. 121:20-122:2).

### III. Eighth Amendment Claims

The Eighth Amendment's prohibition against cruel and unusual punishment creates a right to adequate medical care for incarcerated persons. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021); *see Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). "To prove a violation of that right, a plaintiff must prove that a defendant actually knew of a serious health need and acted with deliberate indifference to the plaintiff's suffering." *Howell*, 987 F.3d at 653.

The defendants argue they are entitled to summary judgment because Mr. Ransom was not suffering from a serious medical need. They may be correct that an amputated limb, without more, does not qualify as a serious medical need. *See Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006) (where plaintiff's amputation had healed and he used a prosthesis, it was "not obvious that his condition constituted a 'serious medical need' in the context of Eighth Amendment"). But based on the facts presented in this case, a reasonable jury could find that Mr. Ransom's condition, coupled with the lack of new supplies, caused him sores and discomfort toward the end of his time at Correctional Industrial Facility. Dkt. 102-1 at 45 (Ransom Dep. 121:8-12). And even "[a] few

8

days' delay in addressing a painful but readily treatable condition can support a claim of deliberate indifference." *Bentz v. Ghosh*, 718 F. App'x 413, 417 (7th Cir. 2017); *see Howell*, 987 F.3d at 653 ("Denying or delaying appropriate treatment to an incarcerated person suffering from avoidable pain can violate the Eighth Amendment."). For purposes of this motion, the Court assumes that Mr. Ransom can show that he had a serious health need and turns to the question of deliberate indifference.

### A. Nurse Shuck

Mr. Ransom's allegation against Nurse Shuck is based on her having classified him as having "No Disability" in early June. Dkt. 102-1 at 30 (Ransom Dep. 61:3–62:3).

The only alternative disability classifications are vision impairment ("B"), mobility impairment ("C"), and hearing loss ("D"). *See* dkt. 102-3 at 19. Classifications "B" and "D" clearly do not apply, leaving "C" as the only plausible alternative. No reasonable jury could find that Nurse Shuck was deliberately indifferent for concluding that Mr. Ransom was "capable of performing activities of daily living" and did not suffer from an "impairment that substantially limit[ed] [his] gross motor movement (e.g., paraplegia, stroke with hemiplegia)." *Id.* This is especially true because Nurse Shuck assigned Mr. Ransom a "G1" medical status classification, thereby documenting Mr. Ransom's "stabilized, permanent or chronic physical or medical condition." *Id.* at 7. Moreover, Mr. Ransom has not designated evidence from which a jury could find that Nurse Shuck, having only seen Mr. Ransom once shortly after he arrived at CIF, acted with deliberate

9

indifference to his suffering. Indeed, Mr. Ransom has not designated evidence that he experienced any suffering related to his amputated leg until late July 2019. *See* dkt. 102-1 at 74 (Ransom Dep. Exh. E).

Nurse Shuck is therefore entitled to summary judgment on Mr. Ransom's Eighth Amendment claim.

### B.     HSA Hufford, Nurse Burdette, and Nurse King

Mr. Ransom argues that HSA Hufford, Nurse Burdette, and Nurse King were deliberately indifferent to his serious medical condition when they failed to promptly obtain extra prosthetic supplies. Dkt. 110 at 2–3. But the undisputed evidence shows that each of these defendants was responsive to Mr. Ransom and took reasonable steps to try to get Mr. Ransom's supplies and, once they were aware of it, to mitigate his pain.

Nurse King and Nurse Burdette learned about Mr. Ransom's need for supplies between June 24 and June 26, 2019. Dkt. 102-4 at 1. Nurse King immediately researched retail options, but Mr. Ransom explained that there were no such options. Dkt. 102-1 at 11 (Ransom Dep. 39:9–40:3). Mr. Ransom gave her the contact information for his prosthetics supplier on July 1, and Nurse King contacted the supplier sometime before July 17—the timing is unclear from the record—but ran into issues with payment. Dkt. 102-4 at 2–3. She then submitted a request on July 26 to have Mr. Ransom evaluated for new supplies at an outside clinic, but the medical director wanted more evidence before approving the request. *Id.* at 14. Nurse Burdette and HSA Hufford met with Mr. Ransom on July 31, and HSA Hufford promptly ordered barrier cream and

10

socks. Dkt. 102-1 at 75 (Ransom Dep. Exh. E). Someone resubmitted the request for an offsite evaluation, and Mr. Ransom was sent to the outside clinic on August 15. Dkt. 102-4 at 15; dkt. 102-5 at 13. Nurse Burdette followed the outside specialist's recommendation and gave Mr. Ransom unscented liquid hand soap to wash his liners. Dkt. 102-5 at 11, 13.

To be sure, there was a considerable passage of time from when Nurse King and Nurse Burdette first learned about Mr. Ransom's need for supplies (on or about June 26, 2019) until he was approved for an offsite evaluation (on or about August 5, 2019). But there's no designated evidence showing that Nurse King, Nurse Burdette, or HSA Hufford were aware that the lack of supplies was causing Mr. Ransom pain until on or after July 28, 2019. *See* dkt. 102-1 at 74 (Ransom Dep. Exh. E). By then, Nurse King had already put in a request to have Mr. Ransom evaluated at an offsite clinic. Dkt. 102-4 at 8–10 (request made July 26, 2019). And when the prison medical director required more evidence before approving the request, Nurse Burdette and HSA Hufford promptly met with Mr. Ransom to take pictures of his supplies and re-submitted the request. Dkt. 102-1 at 75 (Ransom Dep. Exh. E).

In short, no reasonable jury could find that any of these defendants "acted with deliberate indifference to [Mr. Ransom's] suffering." *Howell*, 987 F.3d at 653. They took reasonable, albeit at times unfruitful, steps to help get Mr. Ransom appropriate prosthetic supplies. And even if one could conclude that one or more of these defendants were negligent in responding to Mr. Ransom's needs and procuring the supplies he needed, that's not enough for a jury to find

in his favor. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("Negligence—even gross negligence—is insufficient to meet [deliberate indifference] standard . . ."). HSA Hufford, Nurse Burdette, and Nurse King are therefore entitled to summary judgment on Mr. Ransom's Eighth Amendment claims.

    **C.**    **Warden Knight, Mr. McMullen, Major Fox, Mr. Randolph, and Mr. Stafford**

Mr. Ransom argues that Warden Knight, Mr. McMullen, Major Fox, and Mr. Stafford knew about his various difficulties and did nothing about them:

- Warden Knight knew that Mr. Ransom was "unable to stand in the shower, [had] problems walking up and down stairs, and [had] other serious medical needs."

- Mr. McMullen knew about "Mr. Ransom being unable to stand . . . in the shower, his inability to be in a top bunk, and his difficulty with stairs."

- Major Fox knew about "the actions taken by Indiana Department of Correction staff."

- "Mr. Stafford was aware of the serious medical needs of Mr. Ransom."

Dkt. 111 at 2–3 (response to motion for summary judgment).

But the evidence does not support Mr. Ransom's arguments. First, there is no admissible evidence about Warden Knight's knowledge. Mr. Ransom testified that his mother told him that she had called Warden Knight and discussed Mr. Ransom's medical needs. Dkt. 102-1 at 43 (Ransom Dep. 114:10–115:5). Mr. Ransom's testimony about his mother's conversation with Warden Knight is inadmissible hearsay, and Mr. Ransom does not present a declaration or affidavit from his mother. Therefore, there is no admissible, designated evidence of any such conversation having taken place.

12

There is evidence that Mr. McMullen and Major Fox knew that Mr. Ransom was having trouble taking showers. But they either tried to help Mr. Ransom or referred him to medical staff who tried to help. *See* dkt. 102-1 at 34 (Ransom Dep. 76:4–6); *id.* at 81–84 (Ransom Dep. Exh. G). And Mr. Ransom himself testified that he was able to shower, even though it was difficult. *Id.* at 37 (Ransom Dep. 91:10–12) ("I'm not saying I didn't take a shower there. I'm saying it was so difficult for me to take a shower there.").

There is also evidence that Mr. Stafford and Mr. Randolph received and reviewed grievances in August about Mr. Ransom's complaints. But the undisputed evidence would not allow a jury to find that either Mr. Stafford or Mr. Randolph ignored Mr. Ransom's condition. Instead, they reviewed his grievances and reasonably relied upon medical personnel to attend to Mr. Ransom's medical needs. *See* dkt. 102-1 at 81–84 (Ransom Dep. Exh. G); *see Johnson v. Doughty*, 433 F.3d 1001, 1010–11 (7th Cir. 2006) (affirming grant of summary judgment for grievance counselor who "took [the plaintiff's] medical complaints seriously and reasonably relied upon the doctors' recommendations in handling [the plaintiff's] condition").

Warden Knight, Mr. McMullen, Major Fox, Mr. Randolph, and Mr. Stafford are all entitled to summary judgment on Mr. Ransom's Eighth Amendment claims.

### IV.   State Law Negligence Claims

"When federal claims drop out of the case, leaving only state-law claims, the district court has broad discretion to decide whether to keep the case or

relinquish supplemental jurisdiction over the state-law claims." *RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012). And when, as in this case, "the federal claims are dismissed before trial, there is a presumption that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016). The Seventh Circuit has identified circumstances when the presumption should be set aside. *RWJ Mgmt. Co.*, 672 F.3d at 480 (when "the statute of limitations has run on the pendant claim," when "substantial judicial resources have already been committed," or "when it is absolutely clear how the pendent claims can be decided"). But none of those apply here. *See* 28 U.S.C. § 1367(d) (limitation period tolled for claims over which district court exercised supplemental jurisdiction); Ind. Code § 34-11-8-1 (allowing plaintiff to continue action in state court). The Court therefore applies the presumption and relinquishes supplemental jurisdiction over Mr. Ransom's state law claims. Those claims are **DISMISSED** without prejudice.

## V.    Conclusion

The defendants' motions for summary judgment, dkts. [102] and [105], are **GRANTED** as to all of Mr. Ransom's Eighth Amendment claims. The Court relinquishes supplemental jurisdiction over Mr. Ransom's state law claims, so those claims are dismissed without prejudice. Final judgment shall now enter.

**SO ORDERED.**

Date: 2/10/2022

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

MARK RANSOM
12291 Saint Augustine St.
Leopold, IN 47551

Bryan Findley
CASSIDAY SCHADE LLP
bfindley@cassiday.com

Heather Terese Gilbert
CASSIDAY SCHADE LLP
hgilbert@cassiday.com

Nancy Kay Goldburg
INDIANA ATTORNEY GENERAL
nancy.goldburg@atg.in.gov

Adrienne Nicole Pope
INDIANA ATTORNEY GENERAL
adrienne.pope@atg.in.gov

Marilyn A. Young
CASSIDAY SCHADE LLP
myoung@cassiday.com